IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **DEBRA DILLMAN PIERCE,** *personal* | ) | |
| *representative of the Estate of Marion B.* | ) | |
| *Dillman, deceased,* | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 11-00102-KD-M** |
| | ) | |
| **JP MORGAN CHASE BANK, N.A.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Docs. 41, 42, 43, 44), Plaintiff's Response (Docs. 48, 49) and Defendant's Reply (Doc. 50).

**I.    Findings of Fact**[1]

This action stems from Plaintiff's complaint[2] against Defendant JP Morgan Chase Bank, N.A.'s ("Chase") for violations of the *Federal Truth in Lending Act*, 15 U.S.C. § 1601 *et seq.* and *Regulation Z*, 12 C.F.R. § 226.1 *et seq.*; the *Fair Credit Billing Act*, 15 U.S.C. § 1666 and *Regulation Z,* 12 C.F.R. § 226.13(e); and state law (breach of contract and breach of implied covenants), relating to her home equity line of credit agreement ("HELOC").  (Doc. 1).

Specifically, on October 22, 2003, Marion Dillman ("Dillman") executed a 10 year HELOC for $36,500.00 with Washington Mutual Bank, F.A ("WaMu"), secured by real property located at 5355 West Vineland Road, Orlando, Florida.  (Doc. 1 at 2-3; Doc. 42-1 at 20-37; Doc.

_____

[1]  At the summary judgment stage, the facts are taken in the light most favorable to the non-movant – here, the Plaintiff. See, e.g,  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993).

[2]  This case was initiated as a class action complaint.  Only Plaintiff's individual claim, however, is presently before the Court on summary judgment.

42-1 at 9 (Dep. Dillman at 64); Doc. 49 at 6, 7, 9 (Dep. Dillman at 21, 27, 29)).

The terms of the HELOC provide specific provisions with respect to the application of finance charges, billing statements, payments and billing disputes, noting that finance charges accrue daily:

> **FINANCE CHARGES** on each advance accrue from the date we make the advance until the date the advance is paid in full. This means there is no free ride period which would allow you to avoid a **FINANCE CHARGE** on advances on your Credit Line. **FINANCE CHARGES** accumulate each day until the exact current payoff amount is received and posted to your Credit Line Account. The exact current payoff amount as of any day is the aggregate of all unpaid advances, plus all accrued and unpaid **FINANCE CHARGES** plus other amounts due hereunder, if any…
>
> The periodic **FINANCE CHARGE** on your Credit Line for each billing period is a function of the Dally Periodic Rate (shown on your Periodic Statement as detailed below, the "Average Daily Balance" of your Credit Line Account (shown on your Periodic Statement) and the number of days in the billing period.
> (a) The "Daily Balance" of your Credit Line Account for each day will be the Total Balance at the beginning of that day plus new advances and charges less all payments and credits received that day and less any over limit fees, late fees and unpaid **FINANCE CHARGES**. The "Total Balance" is all amounts due on the Credit Line Account.
> (b) The "Average Daily Balance" is the sum of the Daily Balances of all days in the billing period divided by the number of days in the billing period.
> (c) The Daily Periodic Rate may vary within a single billing period. If the Daily Periodic Rate does not vary during the billing period, the periodic **FINANCE CHARGE** for the billing period is the Average Daily Balance multiplied by the applicable Daily Periodic Rate multiplied by the number of days in the billing period. If there is more than one Daily Periodic Rate within a billing period, the **FINANCE CHARGE** for the billing period will be the sum of the **FINANCE CHARGES** computed by multiplying the Average Daily Balance by each Daily Period Rate and then multiplying that number by the number of days that the Dally Periodic Rate is in effect during that billing period.
> \* \* \*
> Periodic Statement. Each month your Credit Line Account has any balance owing or a credit balance, or each month in which a **FINANCE CHARGE** is imposed, we will mail to you a billing statement ("Periodic Statement") showing, among other things, all new transactions since the prior Periodic Statement closing date, the Periodic Statement closing date, the total amount you owe us as of the Periodic Statement closing date labeled "New Balance"), the **FINANCE CHARGES** other charges and **ANNUAL PERCENTAGE RATE** for the billing period covered by the Periodic Statement. The Periodic Statement may not be on a calendar month basis. We reserve the right to change the Periodic Statement closing date.
>
> Payments….Your minimum monthly payment…will be equal to all accrued but unpaid **FINANCE CHARGES**, Late Fees and Other Fees and Charges.

> You may pay more than the Minimum Payment due without penalty at any time….
>
> …Payments received will be applied against your outstanding balance in the following order: to accrued but unpaid **FINANCE CHARGES,** then to late fees, then to other fees and charges, then to principal not yet due.

(Doc. 42-1 at 31-34); Doc. 49 at 8-9 (Dep. Dillman at 28-29).

On September 25, 2008, WaMu was placed into receivership of the Federal Deposit Insurance Corporation ("FDIC"); WaMu's portfolio included Dillman's HELOC.  (Doc. 42-2 at 3 (Decltn. Walcutt)); Doc. 49 at 64).[3]  Subsequently, Defendant JP Morgan Chase Bank, N.A. ("Chase") acquired WaMu's portfolio and began servicing Dillman's HELOC. (Id.; Doc. 42-2 at 26-69).  Notably, on October 10, 2008 Chase informed Dillman that it was taking over the servicing of the HELOC *effective September 25, 2008*; the correspondence stated "[t]his assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage documents, other than terms directly relating to the servicing of your loan." (Doc. 42-3 at 3-4 (10/10/08 Letter); Doc. 49 at 15 (Dep. Dillman at 49)).  Chase informed Dillman that although it is the servicer of her loan effective September 25, 2008, and that her loan will be serviced by Chase under the Washington Mutual name "for now." (Doc. 42-3 at 3).

When Chase began servicing Dillman's HELOC in September 2008, it used the servicing system previously used by WaMu and issued billing statements to Dillman with WaMu (rather than Chase) on same until July 2009.  (Doc. 42-1 at 38; Doc. 42-4 (Dep. Walcutt at 47); Doc. 42-2 at 3 (Decltn. Walcutt); Doc. 42-5 (Dep. Krieger at 34-35)).  Billing statements during this period confirms that Chase was processing Dillman's payments in the same manner WaMu had: any payment in excess of the minimum amount due was applied to principal.

---

[3]  Linda Walcutt is a Senior Vice-President of Chase.  (Doc. 42-2 at 1 (Decltn. Walcutt)).

The first billing statement that Dillman received with Chase's name (only) was for the July 12, 2009-August 12, 2009 billing period. (Doc. 49 at 94; Doc. 49 at 17 (Dep. Dillman at 62); Doc. 49 at 41-42 (Dep. Walcutt at 46-47); Doc. 49 at 59-60 (Dep. Krieger at 45-46)). This Chase billing statement shows a minimum payment due of $99.74 by September 6, 2009; the statement activity indicates Dillman had paid $100.00 on August 6, 2009, that the entire $100.00 was applied to interest and that she owed $103.02 in interest for this new billing period. (Doc. 49 at 94). There is no indication in this statement that any amount was applied to principal. Dillman's handwritten notation on this statement indicates that she paid $120.00 on September 3, 2009 (presumably for the July 12, 2009-August 12, 2009 billing statement) – thus $20.26 more than the minimum due. On Chase's next billing statement for the period August 13, 2009-September 11, 2009, a minimum payment of $76.57 was due by October 6, 2009; the statement activity appears to confirm Dillman's handwritten notation that she had paid $120.00 on September 3, 2009 (for the prior billing period) of which $96.83 was applied to interest accrued during that billing period. There is no indication that any amount was applied to principal. (Doc. 49 at 95; Doc. 49 at 41-42 (Dep. Walcutt at 46-47); Doc. 49 at 49 (Dep. Krieger at 55)). Dillman's handwritten notation on this billing statement indicates that she paid $106.57 on October 6, 2009 for the August 13, 2009-September 11, 2009 bill – thus, $30.00 more than the minimum due. (Doc. 49 at 95). There is no indication as to how that excess payment was applied as no records for same have been submitted.

On July 24, 2009, Chase converted Dillman's HELOC to its servicing system (the VLS system based on daily simple interest versus WaMu's ACLS system which was an average daily balance method). (Doc. 42-4 at 4-5, 10 (Dep. Walcutt at 23-24, 47); Doc. 42-5 at 3-4 (Dep. Krieger at 34-35); Doc. 42-2 at 3 (Decltn. Walcutt)). Under the VLS system, payments are

4

applied to accrued but unpaid finance charges as of the date a payment is received – which may be different than the accrued but unpaid finance charges reflected on a billing statement as finance charges accrue daily (*i.e.*, includes accrued but not yet billed charges).  According to Chase, Dillman is just required to make the minimum payment reflected on the billing statement, but if she makes a payment in excess of the minimum, the excess is applied first to all accrued finance charges.  According to Chase's expert Krieger:

> The basic issue is that the payments, while being applied in the same order, the amount of accrued financial charges that they were being applied to was different under the two systems, under the two methods….So in the first situation, payments were applied to accrued finance charges that were outstanding at the end of the previous billing. Where under the Chase system, the payments were applied to accrued finance charges from not only into that last billing period, but also periods of time up until the payment was actually applied.

(Doc. 49 at 46 (Dep.  Krieger at 29)).

Because Chase does not "yield payments to principal" like WaMu, "the interest that was due on the Chase method is going to be slightly higher than the interest that will be due on the average daily balance method."  (Doc. 49 (Dep. Saunders at 178)).  More specifically, according to a Senior Vice-President at Chase who reviewed Dillman's HELOC and Chase's billing regarding same: "[a]ny finance charges paid by Dillman that accrued from the closing date of the billing statement through the date Chase received the payment were credited on the next billing statement so that finance charges on the next billing statement were less than they otherwise would have been if no monies were applied to additional accrued finance charges."  (Doc. 42-2 at 3 (Decltn. Walcutt)).

In late Summer of 2009, Dillman noticed on her billing statement that Chase had started crediting her payments differently: Chase applied the portion of her payment which was in excess of the unpaid finance charges to interest rather than to principal.  (Doc. 1 at 4 at ¶¶17-19; Doc. 49  at 18-23 (Dep. Dillman at 67-72); Doc. 42-1 at 11 (Dep. Dillman at 78)).  On November

2, 2009, Dillman wrote Chase stating that her payments in excess of the minimum payments due were not being applied properly as they were "being held and applied to future finance charges" (interest) instead of to the principal.  (Doc. 42-1 at 43); Doc. 49 at 18 (Dep. Dillman at 67)). Dillman requested that Chase credit the funds she submitted in excess of the minimum payment due to the principal "which in turn will decrease, even in small amounts, the interest charged." (Doc. 42-1 at 43).

On November 18, 2009, Chase responded to Dillman, explaining how it applies payments and notifying her as to how she can make principal-only payments.  (Doc. 42-1 at 44; Doc. 42-1 at 11 (Dep. Dillman at 78)).  In the letter, Chase explained that "[w]hen your regular monthly payment is received, it is applied in a manner that satisfies all outstanding accrued interest charges and other applicable fees first. Any remaining amount is then applied to your principal balance. Per your contract, you must pay any additional funds that you would like to be applied to principal only as a separate principal reduction payment."  (Doc. 42-1 at 44; Doc. 42-1 at 11 (Dep. Dillman at 78); Doc. 42-2 at 4 (Decltn. Walcutt)).  Chase also notified Dillman that she could make a "principal-only" payment using one of four methods: at a Chase branch; on-line at www.chase.com; or by mail to the address provided.  (Doc. 42-1 at 44; Doc. 42-1 at 13 (Dep. Dillman at 81)).

Dillman never made "principal-only" payments to Chase through any of these 4 methods.  (Doc. 42-1 at 10, 13 (Dep. Dillman at 65, 81)).  Instead, Dillman made payments on her HELOC on-line, through her credit union McCoy Federal Credit Union.  (Doc. 42-1 at 9 (Dep. Dillman at 64); Doc. 49 (Dep. Dillman at 81)).  Relevant to the claims raised in this case, in February, March and April 2010, Dillman attempted to make three (3) "principal-only" payments to Chase Home Finance from her credit union's online banking

website (via electronic transfer) with the word "principal" in capital letters on the payment. However, Chase did not apply those payments to the principal. (Doc. 42-1 at 13-15 (Dep. Dillman at 81-83); Doc. 42-1 at 45). Chase's payment processing department does not receive any special notations made by a borrower in connection with on-line payments made from a website outside of www.chase.com, such as through Dillman's credit union's on-line payments. (Doc. 42-2 at 4 (Decltn. Walcutt) ) .

On March 1, 2010, Dillman wrote Chase asserting that the bank was still not applying her excess payments (above the minimum due) to the principal but instead was holding the excess to be applied to future interest computed days after her payment, and referenced her on-line "principal-only" payments through her credit union. (Doc. 42-1 at 49). On March 23, 2010, Chase responded in writing to Dillman and told her: "[p]er your contract, you must pay any additional funds toward additional principal as a separate principal reduction payment[,]" and then instructed her as to how she could make principal-only payments (providing her with a separate address for same and instructing her that she could "indicate on her payment coupon or check, the amount that should be applied as additional principal[]"). (Doc. 42-1 at 50; Doc. 1 at 5 at ¶21; Doc. 42-1 at 16 (Dep. Dillman at 99); Doc. 42-3 at 11). Chase added that "[y]ou may also set up an automatic debit of a principal only payment from a checking or savings account." (Doc. 42-1 at 50). Chase noted that "[w]hen your regular monthly payment is received, it is applied in a manner that satisfies the total amount of accrued interest on your account and other applicable fees first. Any remaining amount is then applied to your principal balance." (Doc. 42-1 at 50).

Chase's "VLS Amortization Schedule" for the period of July 23, 2009-August 26, 2011 indicates that Chase applied Dillman's excess payments to the principal on three (3) occasions

($.62 on 2/5/10, $25.95 on 4/6/10 and $23.03 on 5/6/10).  (Doc. 42-3 at 17-30).   Chase asserts, and Dillman has not refuted, that it never applied payments to unaccrued finance charges.  (Doc. 42-2).

## II.   Conclusions of Law

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).  Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

### A.   Count I: Fair Credit Billing Act:  15 U.S.C. § 1666/12 C.F.R. § 226.13(e)

Dillman alleges that Chase violated her rights under the *Fair Credit Billing Act* ("FCBA"),[4] 15 U.S.C. § 1666-1666j, because Chase failed to conduct a reasonable investigation of her billing error dispute and/or to correct the billing error dispute.  (Doc. 1 at 6 at ¶29).  To succeed on this claim, Dillman must establish 1) the existence of a billing error; 2) timely notification of the billing error to Chase; and 3) failure of Chase to comply with the procedural requirements of Section 1666.  See, e.g., Cunningham v. Bank One, 487 F. Supp. 2d 1189, 1191-1192 (W.D. Wash. 2007).

The FCBA's Section 1666 procedural requirements provide that if proper notice of a billing error is provided by the borrower, the creditor must: 1) send a written acknowledgment of the notice within 30 days; 2) investigate the matter; and 3) *either* correct

---

[4]  Added as Part D of the *Truth in Lending Act* ("TILA").  The FCBA is enforced by TILA, 15 U.S.C. §§ 1601–1677, and implemented by *Regulation Z*, 12 C.F.R. §§ 226.1–226.36.  See Esquibal v. Chase Manhattan Bank, N.A., 487 F. Supp. 2d 818, 825 (S.D. Tex. 2007); Rigby v. FIA Card Services, N.A., Slip Copy, 2011 WL 6669052, *2 at n.1 (S.D. Ala. Nov. 21, 2011).

the debtor's account *or* give a written explanation of the disputed billing error within 90 days.  See 15 U.S.C. § 1666(a); Esquibel v. Chase Manhattan Bank, N.A., 487 F. Supp. 2d 818, 825 (S.D. Tex. 2007); Garner v. MBNA American Bank, N.A., 2006 WL 2354939, *5 (N.D. Tex. Aug. 14, 2006).

At the outset, Chase contends that Dillman did not comply with the FCBA's "billing error" notice requirements.[5]  For summary judgment purposes – and taking Dillman's facts in the lights most favorable to her -- the Court assumes that Dillman satisfied the notice requirements and that a billing error existed.[6]  Nevertheless, even assuming such, Chase contends that Dillman's claim fails because Chase complied with the FCBA procedural requirements relating to conducting a reasonable investigation and providing Dillman with a written explanation.

Dillman first contends that Chase failed to reasonably investigate her billing error dispute.  Under Regulation Z § 226.13(f), a "reasonable investigation" is required by the creditor when a creditor determines that no billing error occurred or that a different billing error occurred from that asserted. The evidence Chase has submitted regarding any investigation it conducted

---

[5] Under the FCBA, a borrower must provide written notice within 60 days after the creditor transmits an account statement that: "(1) sets forth or otherwise enables the creditor to identify the name and account number (if any) of the obligor, (2) indicates the obligor's belief that the statement contains a billing error and the amount of such billing error, and (3) sets forth the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error." 15 U.S.C. § 1666(a).

[6] The Court is unwilling to say as a matter of law that Dillman's written notice failed to satisfy the FCBA regarding its notice requirements and/or that a billing error existed. Dillman is not required to specifically identify a particular billing error but rather only to set forth the reasons she believes – *to the extent applicable*– that there is a billing error (and such includes a consumer's request for clarification). The same "to the extent applicable" language is set forth in *Regulation Z*, § 226.13. See, e.g., Burnstein v. Saks Fifth Ave. & Co., 208 F. Supp. 2d 765, 775 (E.D. Mich. 2002) (providing that both the FCBA and Regulation Z "contemplate that a consumer may not possess all of the information necessary to precisely identify the extent of a claimed billing error. The regulation provides that the requisite written notice from the consumer must, '[t]o the extent possible, indicate…the consumer's belief and the reasons for the belief that a billing error exists, and the type, date, and amount of the error.")

consists of the written explanatory letters to Dillman, in response to her billing error notices.  On summary judgment, Chase asserts that "[t]he letter demonstrates that Chase investigated her allegations by reviewing her records, including her HELOC agreement." (Doc. 42 at 12).  While Chase's two (2) separate written explanations letters do not specifically state that an investigation was conducted, Chase relies on the phrase "per your contract" (referencing Dillman's HELOC) in same.  This reference, and Chase's reliance on same, suggests that Chase reviewed Dillman's HELOC (conducted some form of investigation) and from that review concluded that "you must pay any additional funds that you would like to be applied only as a separate principal-reduction payment."  As set forth in Burnstein v. Saks Fifth Ave. & Co., 208 F. Supp. 2d 765, 775 (E.D. Mich. 2002): "[t]he creditor need only make a reasonable attempt to construe the consumer's complaint, investigate the claim so construed, and report back to the consumer within 90 days as to the merit of this apparent claim. There is, in other words, no penalty for "wrong guesses" made in good faith; the federal statute establishes only the procedural framework for dispute resolution, and does not concern itself with the substantive outcome of this process."  Dillman suggests that because Chase's interpretation of the HELOC is incorrect, the investigation was not reasonable.  Even assuming Chase was wrong, under the circumstances of this case, the Court finds that there is insufficient evidence from which a reasonable jury could find that Chase failed to comply with the statute's procedural requirement (*i.e.*, that Chase failed to make a reasonable attempt to investigate her claim).

Additionally, Dillman contends that Chase failed to correct the billing error.  The record reveals that Chase responded in writing to Dillman's first billing error notice (the November 2009 letter), both acknowledging her letter and explaining why it believed that its application of payments was correct.  Chase also informed Dillman of four (4) ways that she could make

principal-only payments "to avoid any portion of monies in excess of the minimum payment being applied to additional accrued finance charges." (Id. at 13). Chase also responded to Dillman's second billing error notice (the March 2010 letter), explaining why it believed its application of her payments was correct, noting that her payments are applied pursuant to the HELOC agreement, and again informing her how to make principal-only payments. Chase is not required to correct alleged billing errors as Dillman asserts. Rather, Chase is required to *either* provide Dillman with a written explanation *or* correct her account; here, Chase opted to provide a written explanation, and did so twice. See, e.g., Am. Exp. Co. v. Koerner, 452 U.S. 233, 234-237 (1981) (noting that the statute "imposes two separate obligations upon the creditors…must send a written acknowledgement that it has received the notice. And…must investigate the matter and either make appropriate corrections…or send a written explanation of its belief that the original statement…was correct[]"). As such, Chase had no further obligation to *also* correct any alleged billing error under 15 U.S.C. § 1666(a)(3)(B). Thus, Dillman's "obligation to correct" assertion lacks merit.

Moreover, to the extent Dillman relies upon *Regulation Z* § 226.13(e) to assert that Chase was required to correct the billing error (Doc. 48 at 15), and because it did not do so it has violated Section 226.13(e), Dillman's assertion is incorrect. Section 226.13(e) provides that a creditor is required to correct the billing error "[*i]f* a creditor determines that a billing error occurred as asserted…" (emphasis added). As noted *supra*, Chase disputes that any billing error occurred as asserted by Dillman and thus, Chase made no such determination to prompt a correction.

Accordingly, Chase's motion for summary judgment as to Count I is **GRANTED.**

**B.**     <u>Count II</u>: <u>Truth in Lending Act</u>: **15 U.S.C. § 1647(c)/12 C.F.R. § 226.5b(f)(3)**

Dillman alleges that Chase violated her rights under the *Truth in Lending Act* ("TILA") and *Regulation Z* – specifically Sections 1647(c) and 226.5b(f)(3) – by misapplying her payments and unilaterally changing the terms of the HELOC which resulted in "increased price of credit in the form of additional interest." (Doc. 1 at 6 at ¶¶32-35). Dillman contends that Chase unilaterally changed how her payments in excess of the minimum due were applied – applying any excess to accrued but not yet billed finance charges versus to the principal after the billed finance charges were paid.

Chase contends that it applied Dillman's excess payments properly: "[w]hile finance charges accrue daily, Dillman is not required to pay, as part of her minimum payment, accrued but unpaid finance charges that have not yet been billed to her. If, however, Dillman voluntarily pays amounts above the minimum payments, those amounts apply first to outstanding accrued but unpaid finance charges regardless of whether the accrued finance charges are reflected on the billing statement." (Doc. 42 at 14).

TILA and Regulation Z prohibit creditors such as Chase from unilaterally changing material terms of an open end consumer credit plan, 15 U.S.C. § 1647(c)(1), except under certain circumstances under § 1647(c)(2) (*e.g.*, a reasonable belief in an inability to repay, a significant decline in the property's value securing a HELOC, "any change that will benefit the consumer," etc.). Specifically, TILA's Section 1647(c) provides that "[n]o open end consumer credit plan under which extensions of credit are secured by a consumer's principal dwelling may contain a provision which permits a creditor to change unilaterally any term required to be disclosed under section 1637a(a) of this title or any other term, except a change in insignificant terms such as the address of the creditor for billing purposes." 15 U.S.C. § 1647(c)(1). Section 226.5b(f)(3) of

*Regulation Z* provides in relevant part, that no creditor may, by contract or otherwise, change any term, except:

> (i) Provide in the initial agreement that it may prohibit additional extensions of credit or reduce the credit limit during any period in which the maximum annual percentage rate is reached. A creditor also may provide in the initial agreement that specified changes will occur if a specified event takes place (for example, that the annual percentage rate will increase a specified amount if the consumer leaves the creditor's employment). …

> (iii) Make a specified change if the consumer specifically agrees to it in writing at that time.

> (iv) Make a change that will unequivocally benefit the consumer throughout the remainder of the plan.

> (v) Make an insignificant change to terms. …

Dillman alleges that Chase violated Sections 1647(c) and 226.5b(f)(3) because it applied her excess payments (after first applying them to billed finance charges) to accrued but not yet billed finance charges instead of applying it to principal.  Dillman argues that this method of application resulted in a material change to the HELOC as an "increased price to credit in the form of additional interest." Dillman also argues that this does not "unequivocally benefit the consumer throughout the remainder of the plan" but instead results in higher costs to her."

The HELOC provides that payments will be applied against Dillman's "outstanding balance" and first to accrued but unpaid finance charges. ("Payments received will be applied against your outstanding balance in the following order: to accrued but unpaid **FINANCE CHARGES,** then to late fees, then to other fees and charges, then to principal not yet due.") This provision is not ambiguous.  This provision does not become ambiguous simply because WaMu applied the payment in a different manner. The HELOC does not provide that her payments will be applied against her outstanding balance as indicated on her billing statement (*i.e.*, the HELOC does not make a distinction between finance charges billed versus those accrued but not yet billed).  Additionally, the HELOC provides that finance charges accrue daily so the outstanding

balance necessarily changes on a daily basis – *i.e.*, the HELOC contemplates a running daily balance on the account.

Moreover, any finance charges paid that accrued from the closing date of the billing statement through the date Chase received the payment were credited on the next billing statement so that finance charges on the next billing statement were less than they otherwise would have been if no monies were applied to additional accrued finance charges.  (Doc. 42-2 at 3 (Decltn. Walcutt)).

Dillman's reliance on the HELOC's description of Periodic Statements to support a contrary finding is not persuasive; it does not change the clear terms of how payments received will be applied.  Accordingly, Dillman cannot prevail on the claim that Chase unilaterally changed the terms of the HELOC.[7]

Dillman also complains that she should not be required to send a separate principal only payment in order to avoid Chase's payment application method.  Specifically, Dillman argues that this requirement is a unilateral change to the terms of the HELOC.  In response, Chase frames the alleged change as not a change but instead a "benefit to Dillman" (Doc. 42 at 14-15) – presumably relying on TILA's Section 1647(c)(2)(f) ("any change that will benefit the consumer") and *Regulation Z's* Section 226.5b(f)(3)(iv) (to "make a change that will unequivocally benefit the consumer throughout the remainder of the plan").  For this assertion, Chase defines the benefit as providing methods by which Dillman could make "principal-only" payments even though finance charges had accrued on the account.

One fact that was not addressed by Dillman, is Chase's assertion that at no time did it

---

[7] This assumes that any payment in excess of the accrued interest (and any applicable fees) was applied to principal.

apply excess payments to unaccrued interest.  The only reasonable inference from this assertion is that any payments that exceeded accrued interest (and fees) would be credited toward principal as provided in the HELOC.[8]   Accordingly, Dillman is able to pay down principal in her monthly payment if she sends a payment in excess of accrued interest (and any applicable fees).   Chase's principal-only payment method is simply a way to avoid having the extra payment applied to accrued interest and fees.   It does not change the terms of the HELOC.   Accordingly, Dillman claim is without factual support and Chase's motion for summary judgment as to Count II is **GRANTED.**

### C.      Counts III and IV: State Law Claims[9]

1.      Breach of Contract: Breach of the HELOC agreement

Dillman alleges that Chase materially breached the terms of the HELOC by misapplying her payments to unaccrued finance charges. (Doc. 1 at 6 at ¶17, 36-39).

To prevail on a claim for breach of contract under Florida law, Dillman must prove 1) the existence of a contract, 2) a material breach of that contract, and 3) damages resulting from that breach.  See, e.g., Vega v. T–Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009); Silver v. Countrywide Home Loans, Inc., 760 F. Supp. 2d 1330 (S.D. Fla. Jan. 13, 2011). The parties do not dispute the existence of the contract – the HELOC.  Chase disputes any material breach of the HELOC and any damages resulting from same.

Specifically, as noted *supra*, the HELOC provides that finance charges accrue daily and

---

[8] If this were not the case, Dillman would have a viable claim that the terms of the HELOC had been unilaterally changed by Chase.

[9] The parties agree that Florida law applies and governs the state law claims because the HELOC (secured by property located in Florida) provides that it will be governed and interpreted by the laws of the United States and/or the laws of the State of Florida.  (Doc. 42-1 at 36).

that payments received from Dillman are applied to the outstanding balance in a specific order: first, to accrued but unpaid finance charges; second, to late fees; third to other fees and charges; then fourth, to principal not yet due. Under Dillman's interpretation, the excess funds would not be applied to the overall outstanding balance but only to accrued unpaid finance charges that have been billed on the periodic statement (*i.e.*, not the unbilled accrued charges). The HELOC does not include the type of distinction as Dillman presents – differing between accrued finance charges billed and accrued finance charges not yet billed.  Accordingly, Dillman has failed to present facts from which a reasonable factfinder could determine that there was a material breach of the contract. Therefore, Chase's motion for summary judgment on Count III is **GRANTED.**

     2.    <u>Breach of Implied Covenant</u>

Dillman also alleges that Chase breached the implied covenant of good faith and fair dealing, as well contract terms requiring Chase to follow Regulation Z, by changing the application of the payments she made in violation of the HELOC agreement.  (Doc. 1 at 6 at ¶¶44-45).

As set forth in <u>QBE Ins. Corp. v. Chalfonte Condominium Apartment Ass'n</u>, 2012 WL 1947863, 6 (Fla. May 31, 2012): "Florida contract law does recognize an implied covenant of good faith and fair dealing in every contract….to protect "the reasonable expectations of the contracting parties in light of their express agreement. [ ]…there are two limitations on such claims: (1) where application of the covenant would contravene the express terms of the agreement; and (2) where there is no accompanying action for breach of an express term of the agreement. [ ] A duty of good faith must "relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements[ ]…" (citations omitted).  Viewing the facts in the light most favorable to Dillman,

there is not a genuine issue of material fact as to whether Chase breached an express term of the contract, thus her breach of implied covenant claim fails.   Therefore, Chase's motion for summary judgment on Count IV is **GRANTED.**

**III.**   <u>**Conclusion**</u>

Accordingly, it is **ORDERED** that the Defendant's Motion for Summary Judgment (Docs. 41, 42, 43, 44) is **GRANTED**.   It is further **ORDERED** that the parties shall file on or before **August 27, 2012,** a Joint Status Report indicating the status of the class claims in this case in light of the summary judgment ruling as well as any reasons why entry of Final Judgment should not issue for this case.

**DONE** and **ORDERED** this **21st** day of **August 2012.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**